IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


J. FELIX (FERNANDO) CORONA-CERVANTES                          PLAINTIFF

        v.                          Civil No.  5:16-cv-05235

DR. ROBERT KARAS; SAM CAUDLE,
Maintenance, Washington County Detention
Center; ISAAC ANH-TUAN LE, D.D.S.                          DEFENDANTS

### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

        This is a civil rights action filed by the Plaintiff pursuant to 42 U.S.C. § 1983.  Plaintiff

proceeds *pro se* and *in forma pauperis.*

        Plaintiff is presently incarcerated in the Cummins Unit of the Arkansas Department of

Correction.  At all times relevant to this case, Plaintiff was incarcerated in the Washington

County Detention Center (WCDC).  While incarcerated in the WCDC, Plaintiff contends his

constitutional rights were violated in the following ways: he was denied adequate medical care;

he was denied adequate dental care; and he was subjected to unconstitutional conditions of

confinement.  Plaintiff has sued the Defendants in their individual capacities only.

        Dr. Le filed a Motion for Summary Judgment (ECF No. 34).  A Motion for Summary

Judgment (ECF No. 37) was also filed by Dr. Karas and Sam Caudle.[1]  A hearing was held on

July 10, 2017, to allow the Plaintiff to testify in response to the Motions for Summary Judgment.[2]

---

[1] Defendants Dr. Karas and Sam Caudle include Deputy Hammonds in their Summary Judgment Motion (ECF No. 37).  However, Deputy Hammonds was terminated as a Defendant prior to the filing of the Motion.  (ECF No. 32).

[2] English is not the Plaintiff's primary language.  A Spanish interpreter was utilized.

AO72A
(Rev. 8/82)

At the conclusion of the hearing, the case was taken under advisement pending preparation of this report and recommendation.

The Washington County Defendants were asked to, and did, file a Post-Hearing Supplement (ECF No. 46) to their Summary Judgment Motion, containing the medical file of the Plaintiff from October 2016 until the end of June 2017. While these records involved care rendered after the time period at issue in this case, the Court believed the information would be helpful to a full understanding of the Plaintiff's medical conditions.

## I. BACKGROUND

Plaintiff testified he was booked into the WCDC on May 30, 2016. *See also* (ECF No. 39-2 at 1). He was in pretrial status until his conviction on May 10 or May 12, 2017. The period of time at issue in this lawsuit stems from his booking on May 30, 2016, to his filing of the Complaint on September 12, 2016. (ECF No. 1).

### (A). Factual Background Regarding Dental Claim

Dr. Le became a licensed dentist in June of 2013. (ECF No. 34-1 at 1). In addition to his private practice, beginning in 2015, he contracted with Dr. Karas to provide dental care at the WCDC one Saturday per month. (*Id*).

Dr. Le does not have access to kiosk requests and has no input into who is put on the dental list. (ECF No. 34-1 at 2). Detainees are brought to him one at a time and this is the first time he learns about the specific dental problem they have. (*Id*). Dr. Le provides only a narrow scope of services. (*Id*). He can treat ongoing infections with medication or extract teeth. (*Id*).

With respect to extractions, Dr. Le states:

my process is to take a dental history from the detainee. I perform a visual examination of the detainee's mouth. If I identify a tooth that has a level of decay

-2-

or mobility (looseness) that I deem to be clinically significant for potential problems in the short term, I will recommend to the detainee that the tooth be extracted. I will discuss the risks and benefits of extraction and obtain a written consent. I will provide detainee with anesthetic and, when it has taken effect, perform an extraction using the standard techniques I was taught in dental school.

(ECF No. 34-1 at 2).

On June 15, 2016, Plaintiff complained of a broken molar and requested to be placed on the dental call list in order for the tooth to be extracted. (ECF No. 39-4 at 5). He was placed on the dental call list. (*Id*). The next available dental call date at the time was July 16, 2015. (ECF No. 39-8 at 3).

Plaintiff testified that the tooth became infected and the pain kept him from eating. He submitted another medical request on June 22, 2016. (ECF No. 39-4 at 5). On June 27, 2016, medical staff responded and placed Plaintiff on the sick call list, told him he was on the dental call list, and told him he would be provided pain medication. (*Id*).

On June 29, 2016, Plaintiff submitted another medical request about the broken molar and was told he was on the sick call list. (ECF No. 39-4 at 5-6). On June 30, 2016, Plaintiff was examined by a nurse who reported no abscess or drainage and prescribed Naproxen[3] for pain. (ECF No. 39-7 at 6).

On July 16, 2016, Plaintiff saw Dr. Le. (ECF No. 34-1 at 3). Dr. Le noted "significant decay in tooth number one (back molar on the upper right)" and recommended extraction. (*Id*). Plaintiff signed a written consent and the tooth was extracted. (*Id.* at 3 & 6). The consent, among other things, says that "although extreme care will be used the jaw, teeth roots, bone

---

[3]Naproxen is used to "relieve pain, tenderness, swelling and stiffness." https://medlineplus.gov/druginfo/meds/a681029.html (accessed December 6, 2017).

AO72A
(Rev. 8/82)

spicules or instruments used in the extraction procedure may fracture or be fractured, requiring retrieval and possible referral to a specialist." (*Id.* at 3); (ECF No. 39-7 at 41). Plaintiff testified that everything was normal at that time. Plaintiff was prescribed Naproxen and Cephalexin[4] for three days. (ECF No. 39-7 at 9).

Plaintiff indicated that a few days later, the inflammation from the extraction had gone down. However, Plaintiff felt a "little pain" and put in a request because he felt pieces of tooth in his gum. Plaintiff testified he was told that the problem would go away on its own. Several months passed and Plaintiff continued to feel pain in the area of the extraction and in his right eye. He knew the area had gotten infected because of the smell, inflammation, taste, and because it would bleed when he brushed his teeth.

On September 14, 2016, Plaintiff asked to see the dentist related to a "little chunk of teeth." (ECF No. 34-1 at 4). He was placed on the dental call list.

According to Dr. Le, a bone spicule, or small piece of bone material which breaks off the tooth during extraction, is one of the normal complications that can occur in any tooth extraction. (ECF No. 34-1 at 2). The bone spicule may "work its way to the surface and the patient will notice it." (*Id.* at 3). When this happens, Dr. Le extracts the bone spicule. (*Id*). Plaintiff was seen by Dr. Le on November 12, 2016, and he recommended removal. (ECF No. 34-1 at 4; ECF No. 46-2 at 10). According to Dr. Le, "[t]his would have been a minor issue and most likely would not even have required anesthetic." (ECF No. 34-1 at 4). Dr. Le states that Plaintiff "declined to have the bone spicule removed because he had a pending lawsuit." (*Id*); *see also*

---

[4]Cephalexin is an antibiotic used to treat infections cause by bacteria. https://medlineplus.gov/druginfo/meds/a682733.html (accessed December 7, 2017).

AO72A
(Rev. 8/82)

(ECF No. 46-2 at 10). Dr. Le did not see the Plaintiff again during the time period relevant to this case.

Plaintiff testified, in contrast, that when he went to sign the consent for extraction, he noted that it said there was a chance his jaw could become dislocated or he could suffer partial or total paralysis. Plaintiff testified he became scared and refused to sign the consent.

Plaintiff testified he continued to get infections and have pain. Finally, Plaintiff again requested extraction because he could "not stand" the pain. The bone spicule was extracted on June 17, 2017. (ECF No. 46-2 at 28 & 31). Plaintiff testified that after the spicule was extracted he had no further trouble.

The Court has been provided the affidavit of Dr. Lee Hinson. (ECF No. 34-2). Dr. Hinson indicates he obtained his license to practice dentistry in 1983 and has practiced general dentistry in Central Arkansas since then. (*Id*. at 2). Dr. Hinson indicates he is familiar with the standard of care of the practice of general dentistry in Fayetteville, Arkansas, in 2016. (*Id*).

Dr. Hinson notes that a bone spicule is one of the normal complications of any tooth extraction. (ECF No. 34-2 at 3). He indicates the bone spicule is typically not felt by the patient for a few days or weeks. (*Id*). If the patient consents, the spicule can be removed. (*Id*). Dr. Hinson notes this is normally a "minor procedure that often does not even require anesthesia." (*Id*).

Dr. Hinson states that in his opinion Dr. Le "met the applicable standard of care in terms of diagnosis and treatment of the broken molar." (ECF No. 34-2 at 3). Further, he states that the presence of a bone spicule "does not, in and of itself, indicate any type of negligence or

AO72A
(Rev. 8/82)

malpractice on the part of Dr. Le." (*Id*). According to Dr. Hinson, "Dr. Le's response to the bone spicule was within the applicable standard of care." (*Id*).

### (B). Factual Background as to Denial of Medical Care Claim

Dr. Karas has been the jail doctor since January 1, 2016, pursuant to a contract between Washington County and Karas Correctional Health. (ECF No. 39-1 at 2); (ECF No. 39-8 at 1). All medical, dental, and mental health care is coordinated by Karas Correctional Health, which is located inside the WCDC. (*Id*). The term "provider" is used to "refer to the treating medical professional who is either a physician or nurse practitioner." (ECF No. 39-8 at 1).

Detainees can make medical requests daily for review by qualified medical personnel. (ECF No. 39-1 at 2). The requests are made via an electronic kiosk. (*Id*). All kiosk requests for medical care are reviewed by medical staff. (ECF No. 39-8 at 2). All matters of judgment regarding health services are made by contract medical staff or staff of the treating facility. (ECF No. 39-1 at 2); (ECF No. 39-8 at 2).

With respect to the language barrier, Dr. Karas states:

> The Plaintiff is a Mexican national and his English appears to be very poor. The language barrier appears to have created a challenge in communications with the jail staff, but according to the records, Mr. Corona's complaints in Spanish were translated by medical staff and medical staff spoke with Mr. Corona both in Spanish and through the use of a translator when a Spanish-speaking member of staff was not involved in his care.

(ECF No. 39-8 at 2).

Plaintiff testified that with respect to his general medical condition, he was not on any prescription medication when he was booked into the WCDC. Plaintiff testified that other than colds, the only medical problem he had before his incarceration was a rib injury caused when he lifted too much. (ECF No. 39-6 at 17-18). However, on the medical intake questionnaire,

-6-

Plaintiff indicated he had a heart attack eight months ago, attempted to hang himself four years ago but currently had no thoughts of harming himself, and was allergic to milk. (ECF No. 39-7 at 3-4). He further indicated that he did not have a regular doctor and had last seen a doctor four years ago. (*Id.* at 4).

According to Plaintiff, due to the diet he received, he started having problems with his stomach. He became nauseous and had diarrhea the afternoon of his first day, May 30, 2016. Plaintiff submitted a medical request[5] and on May 31, 2016, was treated by the nurse and prescribed Loperamide[6] 4 mg., for diarrhea. (ECF No. 39-7 at 5). Plaintiff testified that this medication did not work. Records show he refused the Loperamide on June 1-2, 2016. Plaintiff testified he was given a stronger medication. The stronger medication caused him to have constipation. He testified that for two or three days he could not use the bathroom.

Plaintiff testified that he strained when attempting to have a bowel movement and that he developed inflammation, pain, and bleeding in his rectal area. He also developed hemorrhoids. Plaintiff testified this could have been avoided if he had received timely medical care and the right medication. Plaintiff testified he was changed from one medication to another. He was given cream for his hemorrhoids and had to apply it internally and externally without gloves or any type of applicator.

---

[5]This request was in Spanish. Plaintiff submitted requests in both English and Spanish. Some of the kiosk requests that were written in Spanish were responded to in Spanish. *See e.g.,* (ECF No. 39-4 at 2).

[6]"[L]operamide is used to control diarrhea, including ongoing diarrhea associated with inflammatory bowel disease." https://medlineplus.gov/druginfo/meds/a682280.html (accessed December 6, 2017).

AO72A
(Rev. 8/82)

On June 2, 2016, Plaintiff asked how much it would cost to have his eyes checked and stated that he needed glasses. (ECF No. 39-4 at 4). He was told that it would require a nurse call which would cost $3. (*Id*). Plaintiff did not respond.

On July 1, 2016, Plaintiff complained of diarrhea and asked for stomach medication. (ECF No. 39-4 at 6). He was put on the sick call list but was not seen. (*Id*); *see also* (ECF No. 39-7 at 7). Instead, Plaintiff was given another prescription for Loperamide, for two weeks, to be taken in the morning only if needed. (ECF No. 39-4 at 6). Plaintiff was also advised to drink plenty of water. (*Id*).

On July 5, 2016, Plaintiff submitted a request for hemorrhoid cream. (ECF No. 39-4 at 6). He refused the morning dose of Loperamide. On July 6, 2016, Plaintiff complained his rectum was bloody and inflamed. (*Id.* at 7); *see also* (ECF No. 39-7 at 7). He requested to be seen and was added to the sick call list. (ECF No. 39-4 at 7). On July 7, 2016, Plaintiff was seen by the nurse and was given Docusate Sodium[7] to help with rectal pain. (*Id*). Plaintiff was prescribed hemorrhoid cream, Colace,[8] and the Loperamide was discontinued. (*Id.* at 7-8).

On July 8, 2016, Plaintiff complained the medications were not working and that bowel movements were painful. (ECF No. 39-4 at 7). He was seen by a nurse on July 9, 2016. (ECF No. 39-7 at 8). He told her he had a hemorrhoid that had given him problems for several years. (*Id*). He was instructed to use Preparation H daily and told that it would take some time for the

---

[7] This is a stool softener which is "used on a short term basis to relieve constipation. . . . They soften stools, making them easier to pass. https://medlineplus.gov/druginfo/meds/a601113.html (accessed December 6, 2017).

[8] Colace is a brand name for a stool softener.

AO72A
(Rev. 8/82)

inflammation to go down.  (*Id*).  Plaintiff was again told the purpose of the stool softener and advised to drink plenty of water.  (*Id*).

Plaintiff initially was prescribed the hemorrhoid cream from July 5, 2016, to July 12, 2016.  However, the hemorrhoid cream prescription was renewed or extended on a number of occasions.  (ECF No. 39-7).  According to Defendants, Plaintiff refused either his morning or evening dose of hemorrhoid cream on multiple days between the months of July and September of 2016 (ECF No. 39-4).

On July 12, 2016, Plaintiff complained that he felt like his blood pressure was high. (ECF No. 39-7 at 9).  He was added to the sick call list.  (ECF No. 39-4 at 8).  On July 13, 2016, blood pressure checks were ordered for the next seven days.  (ECF No. 39-7 at 9).  It was determined no blood pressure medication was needed.  (ECF No. 39-8 at 4).

On July 20, 2016, Plaintiff complained of diarrhea and was placed on sick call.  (ECF No. 39-4 at 9).  Plaintiff reported having some diarrhea and indicated that if he tried to force a bowel movement his rectal area became inflamed and hurt.  (*Id*).  He was placed on sick call. (*Id*).  On July 22, 2016, his prescription for hemorrhoid cream was extended.  Plaintiff reported being fine on July 25, 2016, and as a result he was not seen.  (ECF No. 39-7 at 10).

On July 31, 2016, Plaintiff submitted a medical request stating that his elbow was swollen and he could not bend it.  (ECF No. 39-4 at 11).  He reported that it had been hurting for seven days.  (*Id*).  He was placed on the sick call list. (*Id.*).  On August 2, 2016, he was seen during "med pass" and Naproxen was prescribed and a note made to assess him for a possible gout flair up.  (ECF No. 39-7 at 11); (ECF No. 39-8 at 5).  Plaintiff did not believe he had a history of gout. (ECF No. 39-8 at 5).

AO72A
(Rev. 8/82)

On August 3, 2016, Plaintiff reported that the medication had resolved the inflammation of the muscle around his elbow but that the elbow bone was inflamed.[9] (ECF No. 39-8 at 5). He reported pain, itching, and fever. (*Id*). He also reported that he had spots that hurt and itched. (*Id*). Plaintiff was first placed on nurse call but then moved to doctor call. (ECF No. 39-7 at 11-12).

Plaintiff was seen on August 10, 2016. (ECF No. 39-7 at 14). He reported left elbow pain and swelling for two months that was worse with movement and would get red and hot at times. (*Id*). A mild increase in warmth was noted but no current erythema or overlaying skin changes. (*Id*). Mild to moderate posterior loose fluctance (palpable fluid or tissue) was noted. (*Id*). Plaintiff's Naproxen prescription was extended for two weeks and he was prescribed Acetaminophen. (*Id*); *see also* (ECF No. 39-7 at 14). It was concluded that Plaintiff had gout of the left elbow. (ECF No. 39-7 at 14).

On August 23, 2016, Plaintiff was added to the sick call list due to complaints of stomach pain and inflamed hemorrhoids.[10] (ECF No. 39-4); (ECF No. 39-7 at 14-15). Plaintiff reported the medicine he was on was hurting his stomach; he had inflamed hemorrhoids; and the jail food was not agreeing with him. (*Id*). He said he had not had a bowel movement in two days because of the hemorrhoids and that his stomach was hard. (ECF No. 39-8 at 5).

Plaintiff was seen on August 25, 2016. (ECF No. 39-7 at 16). It was noted bowel sounds were present, he was passing gas, and had hemorrhoids due to constipation. (*Id*). He was

---

[9]This entry is entirely in Spanish. The Court is relying on the statements in Defendants' statement of facts and Dr. Karas' affidavit as to what the request states. (ECF No. 30); (ECF No. 39-8 at 5).

[10]This entry is entirely in Spanish. The Court is relying on the statements in Defendants' statement of facts as to what the request states. (ECF No. 30).

AO72A
(Rev. 8/82)

encouraged to drink fluids and notify staff if his condition did not improve. (*Id*). His hemorrhoid prescription was extended and Tylenol was substituted for Naproxen. (*Id.* at 15-16). He was also prescribed ice as needed for his elbow, two weeks of Famotidine[11] for his stomach complaints, and a stool softener. (*Id*).

On September 10, 2016, Plaintiff asked if medical staff could check his eyes and obtain glasses for him. (ECF No. 39-8 at 6). Staff responded indicating that if he had glasses his family could bring them in. (*Id*). He was told medical staff could not provide glasses. (*Id*).

On September 11, 2016, Plaintiff asked for a blood pressure and diabetes check. (ECF No. 39-4 at 15). He was placed on the med call list. (*Id*). On September 12, 2016, Plaintiff was asked if he had a family history of either condition and if he had any symptoms. (*Id*); (ECF No. 39-7 at 16). Plaintiff did not respond. (ECF No. 39-4 at 15).

Dr. Karas notes that he did not personally see or treat the Plaintiff prior to the filing of this lawsuit on September 12, 2016. (ECF No. 39-8 at 7). However, Dr. Karas states Plaintiff "was seen regularly by nurses and advanced practice nurses who are capable of covering doctor call and prescribing medications." (*Id*).

In Dr. Karas' opinion:

[t]he treatment provided to the Plaintiff was medically appropriate and appears to have addressed the complaints he raised. There is no medical evidence of any injury or damage caused by any delay, however slight, in providing care to Mr. Corona prior to the filing of the Complaint. Corona did not present with any medical emergencies and his symptoms were adequately addressed with common medications and treatments.

(ECF No. 39-8 at 7).

---

[11]Famotidine is used to treat ulcers, gastroesophageal reflux disease, and conditions where the stomach produces too much acid. https://medlineplus.gov/druginfo/meds/a687011.html (accessed December 7, 2017).

AO72A
(Rev. 8/82)

Plaintiff testified he told Dr. Karas via the kiosk that he either did not know how to treat the Plaintiff or was using him as a lab rat. Plaintiff believes his medical problems were caused by the lack of fiber in his diet, bad nutrition, and the lack of proper medical care. Plaintiff testified during his deposition that he named Dr. Karas as a Defendant "because he's in charge of the whole medical aspect." (ECF No. 39-6 at 23). He believes the medical requests were not dealt with promptly, the medication given was ineffective, and he was not given the proper supplies to administer the hemorrhoid cream. (*Id.* at 23-24).

Plaintiff testified he asked that his diet be changed to one rich in fiber. When that was denied, he asked for a different diet for religious reasons. The religious diet did not alleviate his condition.

Plaintiff testified he developed gout in his elbows and knees. The joints were inflamed and he felt "cramped" not being able to move his elbows. Nurse Phebe, a jail nurse, thought it might be the meat that was causing him problems. When this problem initially started on a pain scale of one to ten, with ten being the worst pain, Plaintiff rated his pain at between a seven and eight. At the time of the hearing, he rated his pain as a two or three. Plaintiff testified that he had been prescribed "pills for pain" but he did not feel like they helped. Plaintiff testified that as of the time he filed the complaint, he had not seen Dr. Karas and had only dealt directly with the jail nurses.

On June 14, 2017, more than nine months after he filed the Complaint in this case, Plaintiff underwent a colonoscopy. (ECF No. 46-2 at 21-27). He was diagnosed with Sigmoid diverticulitis and hemorrhoids. (*Id.* at 20). He was to be treated for hemorrhoids. (*Id*).

AO72A
(Rev. 8/82)

**(C). Factual Background as to Unconstitutional Conditions of Confinement Claim**

Plaintiff testified that his claim against Sam Caudle was based on Caudle's failure to ensure that the air conditioning was functioning well. Plaintiff indicated that he was assigned to a maximum security cell, No. 22, which was one of the smallest cells. During the summertime, it was hot in the cell and Plaintiff started to feel like he was being suffocated. Plaintiff testified that he took his clothes off and put water on the floor to cool down. He states that he felt like he was going to lose consciousness.

Plaintiff testified this incident occurred shortly after he became incarcerated at the WCDC. However, he could not recall the exact date. He testified at the hearing that there was only a one day period of time when the air conditioner was not working properly. However, in his deposition, he indicated it had occurred twice when the inmates were locked down in their cells. (ECF No. 39-6 at 12). It was fixed shortly thereafter.

Plaintiff testified during his deposition that he did not submit a grievance about the temperature on the kiosk. (ECF No. 39-6 at 14). Plaintiff stated that he submitted a grievance regarding the air conditioner not working but did not do so via the kiosk. It is clear from the summary judgment materials that Plaintiff knew how to use the kiosk and in fact had submitted a medical request the first day he was at the WCDC.

As relief, Plaintiff seeks to recover money damages from the Defendants. (ECF No. 39-6 at 30).

## II. APPLICABLE STANDARD

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

-13-

R. Civ. P. 56(a). "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.,* 49 F.3d 399, 401 (8th Cir. 1995). The moving party has the burden of showing the absence of a genuine issue of material fact and that they are entitled to judgment as a matter of law, but the nonmoving party may not rest upon mere denials or allegations in the pleadings and must set forth specific facts to raise a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). The Court must view all evidence and inferences in a light most favorable to the nonmoving party. *See McCleary v. ReliaStar Life Ins. Co.,* 682 F.3d 1116, 1119 (8th Cir. 2012). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a Court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III. DISCUSSION

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States. In order to state a claim under 42 U.S.C. § 1983, plaintiff must allege that the defendant acted under color of state law and that he violated a right secured by the Constitution. *West v. Atkins*, 487 U.S. 42 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir. 1999). The deprivation must be intentional; mere negligence will not suffice to state

AO72A
(Rev. 8/82)

a claim for deprivation of a constitutional right under § 1983. *Daniels v. Williams*, 474 U.S. 327 (1986); *Davidson v. Cannon*, 474 U.S. 344 (1986).

### (A).  Medical and Dental Care in General

The Eighth Amendment's prohibition against cruel and unusual punishment establishes the government's obligation to provide medical care for those whom it is punishing by incarceration.  An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.  *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (internal quotation marks and citation omitted).   "For this reason, the Eighth Amendment proscribes deliberate indifference to the serious medical needs of prisoners." *Robinson v. Hager*, 292 F.3d 560, 563 (8th Cir. 2002) (citing *Estelle*, 429 U.S. at 104).  The Eighth Amendment does not, however, mandate that the medical care provided to the prisoner "be perfect, the best obtainable, or even very good." *Harris v. Thigpen*, 941 F.2d 1495, 1510 (11th Cir. 1991).  It has been recognized that "[t]oothaches can be excruciatingly painful, and dental care is an important part of proper health care." *Hartsfield v. Colburn*, 491 F.3d 394, 397 (8th Cir. 2007).

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  The deliberate indifference standard includes "both an objective and a subjective component:  'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)).  The Eighth Circuit

AO72A
(Rev. 8/82)

applies the deliberate indifference standard to both pretrial detainees and convicted inmates. *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014).

"A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)(internal quotation marks and citation omitted).

### (1). Dr. Le

Dr. Le moves for summary judgment on the following grounds: (1) Plaintiff experienced a common and minor complication which merely required extraction of the bone particle; (2) the evidence shows Dr. Le acted promptly and within the applicable standard of care; and (3) there is an insufficient basis to hold Dr. Le liable. Dr. Le notes that he recommended removal of the bone spicule to the Plaintiff but Plaintiff declined to have it removed because of this pending lawsuit.

The Court agrees that there is no evidence that Dr. Le exhibited deliberate indifference to Plaintiff's serious medical needs. It is undisputed that Dr. Le provides only limited services to inmates at the WCDC and does so only one Saturday per month. It is also undisputed that it is the Karas medical personnel who determine whether an inmate needs immediate dental attention and should be put on the list to see Dr. Le at his next visit.

The first time Dr. Le saw the Plaintiff, or knew what type of dental condition he was suffering from, was on July 16, 2016. Because of the condition of the Plaintiff's molar, it was extracted. The fact that a bone spicule was left behind is not evidence of deliberate indifference on Dr. Le's part. At most, it might constitute evidence of negligence. Further,

-16-

when Dr. Le was advised of the existence of the bone spicule, he examined Plaintiff and recommended removal of it. Plaintiff declined. Plaintiff has had no further interaction with Dr. Le during the time period relevant to this case.[12] There is no genuine issue of material fact as to whether Dr. Le exhibited deliberate indifference to Plaintiff's serious dental needs. Dr. Le is entitled to summary judgment in his favor.

Having found that the facts do not make out a constitutional violation, Defendant Le is entitled to qualified immunity. *See, e.g., Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

**(2). Dr. Karas**

Dr. Karas moves for summary judgment on the grounds that: (1) he was not personally involved in Plaintiff's medical care; (2) medical staff were not deliberately indifferent to Plaintiff's medical needs; and (3) he is entitled to qualified immunity.

Dr. Karas' first argument is that he was not personally involved in Plaintiff's medical care and cannot be held liable for the actions of the medical staff. A claim of deprivation of a constitutional right cannot be based on a *respondeat superior* theory of liability. *See Monell v. Department of Soc. Servs.*, 436 U.S. 654, 694 (1978). "[A] supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity." *White v. Holmes*, 21 F.3d 277, 280 (8th Cir. 1994); *see also Whitson v. Stone County Jail*, 602 F.3d 920, 928 (8th Cir. 2010) ("In a § 1983 case, an official is only liable for his own misconduct and is not

---

[12]As noted previously, the bone spicule was extracted by Dr. Le on June 17, 2017 (ECF No. 46-2 at 13 & 28).

-17-

accountable for the misdeeds of his agents under a theory such as respondeat superior or supervisor liability") (internal quotations omitted); *Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997) ("general responsibility for supervising the operations . . . is insufficient to establish the personal involvement required to support liability").

"Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights. To establish personal liability of the supervisory defendant, [Plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (*quoting Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006)); *Mark v. Nix*, 983 F.2d 138, 139-40 (8th Cir. 1993) (section 1983 liability requires some personal involvement or responsibility).

Here, Plaintiff has alleged no causal link between the actions of Dr. Karas and the alleged deprivation of rights. Plaintiff does not allege that he was seen by Dr. Karas, ever spoke with Dr. Karas, or even that Dr. Karas was consulted regarding his medical care during the time period relevant to this case. The treatment provided to the Plaintiff was medically appropriate and addressed the Plaintiff's complaints. Dr. Karas is entitled to summary judgment in his favor. Having found that the facts do not make out a constitutional violation, Dr. Karas is entitled to qualified immunity. *See, e.g., Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

-18-

**(B).  Conditions of Confinement**

The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment.  U.S. Const. amend. VIII.  The Cruel and Unusual Punishment Clause of the Eighth Amendment forbids conditions that involve the "wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime."  *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."  *County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998)(citation omitted).  The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones.  *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

"The Eighth Amendment prohibits punishments that deprive inmates of the minimal civilized measure of life's necessities."  *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996); *see also Hall v. Dalton*, 34 F.3d 648, 650 (8th Cir. 1994)("[I]n this circuit, the standards applied to Eighth Amendment and Fourteenth Amendment claims have been the same").  Jail or prison officials must provide reasonably adequate ventilation, sanitation, bedding, hygienic materials, food, and utilities.  Prison conditions claims include threats to an inmate's health and safety.  *Irving v. Dormire*, 519 F.3d 441, 446 (8th Cir. 2008)(citation omitted).

To state an Eighth Amendment claim, the plaintiff must allege that prison officials acted with "deliberate indifference" towards conditions at the prison that created a substantial risk of serious harm.  *Farmer*, 511 U.S. at 834. "Conditions of confinement, however, constitute cruel and unusual punishment 'only when they have a mutually enforcing effect that produces deprivation of a single, identifiable human need such as food, warmth, or exercise.'"

-19-

*Whitnack v. Douglas County*, 16 F.3d 954, 957 (8th Cir. 1994)(*quoting Wilson v. Sieter*, 501 U.S. 294 (1991)).

This standard involves both an objective and subjective component. The objective component requires an inmate to show that "he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834 (citations omitted); *see also Hudson v. McMillian*, 503 U.S. 1, 2 (1992) (The objective component is "contextual and responsive to contemporary standards of decency")(quotation omitted). To satisfy the subjective component, an inmate must show that prison officials had "a sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834 (citations omitted); *see also Brown v. Nix*, 33 F.3d 951, 954-55 (8th Cir. 1994). The subjective component "requires proof of a reckless disregard of a known risk." *Crow v. Montgomery*, 403 F.3d 598, 602 (8th Cir. 2005)(citations omitted).

Sam Caudle moves for summary judgment on the grounds that: (1) Plaintiff did not exhaust his administrative remedies; (2) there is no proof of deliberate indifference on his part; and (3) he is entitled to qualified immunity.

The Prison Litigation Reform Act (PLRA) in 42 U.S.C. § 1997e(a) provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

Exhaustion is mandatory. <u>Porter v. Nussle</u>, 534 U.S. 516, 524-25 (2002). In <u>Jones v. Bock</u>, 549 U.S. 199 (2007), the Supreme Court concluded that "to properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules." <u>Id.</u> at 218 (internal quotation marks and citation omitted). The Court stated that the "level of detail necessary in a grievance to comply

-20-

with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id.* "[F]ailure to exhaust available administrative remedies is an affirmative defense, not a matter of subject matter jurisdiction." *Lenz v. Wade*, 490 F.3d 991, 993 n. 2 (8th Cir. 2007).

As noted above, inmates at the WCDC have access to an electronic kiosk. The kiosk is to be used for submitting requests or grievances. (ECF No. 39-1 at 2-3). The detainee handbook describes the grievance process and advises inmates that all grievances must be done on the kiosk and submitted within eight hours of the time the event complained of occurred. (ECF No. 39-5 at 25). The grievance is to include the date and time of the event, the name of the person involved, the name of any witnesses, and pertinent details of the event. (*Id*). Here, there is no evidence in the record suggesting the Plaintiff exhausted his administrative remedies with respect to the temperature of the cell block. In fact, he admits he did not file a grievance on the kiosk. (ECF No. 39-6 at 14). Defendant Caudle is therefore entitled to summary judgment on this claim.

However, even if the Court assumes for purposes of this Summary Judgment Motion that Plaintiff did exhaust his administrative remedies, the claim would nevertheless fail. Lack of air conditioning, alone, is an issue of comfort, not unconstitutional cruelty. Extreme cell temperatures, in combination with other factors, can rise to the level of an Eighth Amendment violation. *See e.g. Ball v. LeBlanc*, 792 F.3d 584, 592 (5th Cir. 2015) (housing Angola, Louisiana prisoners "in very hot cells without sufficient access to heat-relief measures, while knowing that each suffers from [medical] conditions that render him extremely vulnerable to serious heat-related injury, violate[d] the Eighth Amendment"); *Chandler v. Crosby*, 379 F.3d 1278, 1297-98 (11th Cir. 2004) (lack of air conditioning in Florida prison was unpleasant but

AO72A
(Rev. 8/82)

not unconstitutionally excessive when temperatures were consistent with residential dwellings without air conditioning and prisoners had access to heat-relief measures). Here, Plaintiff testified he was only subjected to the hot temperatures on one or two occasions. Each time, the air conditioner was repaired and temperatures again regulated. Certainly, Plaintiff was not deprived of a single human need. There is no genuine issue of material fact as to whether a constitutional violation occurred.

Having found that the facts do not make out a constitutional violation, Defendant Caudle is entitled to qualified immunity. *See, e.g., Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

### IV. CONCLUSION

For the reasons stated, I recommend that the Motion for Summary Judgment filed by Dr. Le (ECF No. 34) and the Motion for Summary Judgment filed by Dr. Karas and Sam Caudle (ECF No. 37) be **GRANTED AND THIS CASE DISMISSED WITH PREJUDICE.**

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 28th day of December 2017.

/s/ *Erin L. Wiedemann*
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)